UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SERAFIM GEORGIOS KATERGARIS,

                                             Plaintiff,

                    -v-

CITY OF NEW YORK,

                                             Defendant.

---

22 Civ. 7400 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiff Serafim Georgios Katergaris brings this putative class action under 42

U.S.C. § 1983, alleging that the system used by the City of New York (the "City") for assessing

and reviewing fines for property owners who fail to file required inspection reports violates the

owners' due process rights.  Pending now are the City's motions (1) for summary judgment on

the limited issue of timeliness, and (2) to dismiss for failure to state a claim under Federal Rule

of Civil Procedure 12(b)(6).  For the reasons that follow, the Court, finding Katergaris's sole

claim time-barred, grants the City's motion for summary judgment, and dismisses this case.

I.      **Statement of Facts**

        A.      **Factual Allegations Underlying Katergaris's Due Process Claim**

        Katergaris is a resident of New York City who previously owned a home at 124 W 132nd

Street (the "W 132nd St. Property" or the "Property").  Dkt. 28 ("FAC") ¶ 12.  Katergaris

purchased this property along with his then- (now ex-) wife in November 2014, and sold the

property in June 2021.  *Id.* ¶¶ 12–13.

        The W 132nd St. Property had previously had an active low-pressure boiler, including

during 2013.  *Id.* ¶¶ 46–54.  Under Title 1 of the Rules of the City of New York ("RCNY")

§ 103-01, owners of certain types of properties with low-pressure boilers must file annual low-

pressure boiler inspection reports with the New York City Department of Buildings ("DOB"). *Id.* ¶¶ 18–20. A property owner who fails to comply with this requirement is fined $1,000. *Id.* ¶ 22; *see also* 1 RCNY § 103-01(f)(1). DOB issues violations to property owners who do not file the required inspection report during a one-year inspection period. *Id.* ¶ 9.

In Katergaris's case, a previous owner of the Property who had been required to file an inspection report for the Property failed to do so for the 2013 annual cycle. *Id.* ¶¶ 46–48. The City first issued a violation for this omission in March 2015, some four months after Katergaris had purchased the Property. *Id.* ¶ 60. At the time of purchase, the Property no longer had a boiler, and had been converted into a two-bedroom home—a type of property for which boiler inspections are not required in any event. Katergaris alleges that, in November 2014, when he and his then-wife purchased the property, they were unaware of the earlier violation. *Id.* ¶¶ 46–56.[1] And, as developed further below in the discussion of the City's motion for summary judgment, Katergaris alleges that he did not receive notice of the violation in March 2015, but first learned of it in 2021 when he went to sell the Property. *Id.* ¶¶ 60, 74–76.

After learning of the violation in 2021, Katergaris alleges, he requested a waiver from the DOB. *Id.* ¶ 79. The DOB denied Katergaris a waiver. *Id.* Katergaris alleges that the process for requesting a waiver did not allow him to present arguments, evidence, witnesses, or exhibits, and that his waiver request was not decided upon by a neutral arbiter. *Id.* ¶ 80. He alleges that the City did not furnish him an opportunity to appeal the denial. *Id.* ¶ 81.

On June 9, 2021, to avoid issues with the sale of the Property, Katergaris paid the outstanding violation "under protest." *Id.* ¶ 82. Katergaris twice requested that the money he

---

[1] The FAC states that, on November 19, 2014, the DOB's records "were updated to reflect that the Property did not have a boiler that required an annual inspection." FAC ¶ 56. The Katergarises closed on the property on or about November 12, 2014. *Id.* ¶ 53.

paid ($1,000) be returned to him, but the DOB denied his requests. *Id.* ¶¶ 87, 95. Katergaris also requested a hearing from the City's Office of Administrative Trials and Hearings, but this request too, was denied; Katergaris was directed to contact DOB instead. *Id.* ¶ 89.

### B.    Procedural History

On August 30, 2022, Katergaris filed his initial Complaint. Dkt. 1. On December 5, 2022, the City filed a motion to dismiss. Dkt. 23. On January 17, 2023, after this Court issued an order directing Katergaris to oppose the motion or amend his complaint, Dkt. 25, Katergaris filed the First Amended Complaint, the operative complaint today. Dkt. 28 ("FAC"). Like the initial Complaint, the FAC brought a single claim, under Section 1983, alleging that DOB's practice of issuing fines to property owners violated due process, on the grounds that the property owners did not have a meaningful opportunity to contest the fines or appeal them. See FAC ¶¶ 1–2.

On January 31, 2023, the City filed a motion to dismiss the FAC. Dkt. 32. On February 14, 2023, Katergaris filed a response. Dkt. 33. On March 7, 2023, the City filed a reply. Dkt. 36.

The City's motion to dismiss included the argument that Katergaris's Section 1983 claim was untimely. It contended that the three-year statute of limitations began to run from the date that a notice of violation was mailed to Katergaris, which the City contended was in 2015. In support, the City filed a declaration of DOB-employee Juan Ruiz attesting to DOB's mailing procedures. *See* Dkt. 31. Because the declaration was outside the pleadings, it was not appropriate for consideration on a Rule 12 motion to dismiss. On July 17, 2023, the Court therefore converted the City's motion to dismiss—to the extent it was based on a claim of untimeliness—to a motion for summary judgment, and directed the parties to conduct limited discovery as to the timeliness of the notice of violation. Dkt. 37. The Court set a briefing

schedule for any limited motion for summary judgment on the timeliness issue, stating that, if necessary, it would also rule on the balance of the City's motion to dismiss at the time it resolved the City's summary judgment motion. *Id.*

Consistent with the schedule the Court set, on November 17, 2023, the City filed the instant motion for summary judgment, Dkt. 42, a memorandum of law and declaration in support with attached exhibits, Dkts. 44, 45 ("Def. Br."), and a Rule 56.1 statement, Dkt. 43. On December 1, 2023, Katergaris filed an opposition to the motion, Dkt. 47 ("Pl. Br."), declarations in support with attached exhibits, Dkts. 48–49, and a counter Rule 56.1 statement, Dkt. 50. On December 13, 2023, the City filed a reply, Dkt. 51 ("Def. Reply Br."), an additional declaration, Dkt. 52, and a response to Katergaris's counterstatement, Dkt. 53.

## II.    The City's Summary Judgment Motion Based on Untimeliness

The Court here first reviews the evidence adduced during discovery bearing on the timeliness of Katergaris's claim. The Court then evaluates the City's motion for summary judgment on the grounds that the claim is untimely.

### A.    Facts Adduced During Discovery[2]

Katergaris is a banker with 25 years' experience. Katergaris Dep. at 8. Before buying the W 132nd St. Property in November 2014, Katergaris, who during his life has purchased

---

[2] The Court draws the following facts from the parties' submissions in support of and in opposition to defendant's summary judgment motion. These include the following: (1) the City's Local Rule 56.1 statement, Dkt. 43 ("Def. 56.1"); the declaration of Samantha Schonfeld in support of the motion, Dkt. 44 ("Schonfeld Decl."), and attached exhibits, Schonfeld Decl., Exs. 1 ("Ruiz Dep."), 2 ("Katergaris Dep."), 3 ("Muniz Dep."), 4; the declaration of Juan Ruiz in support of the motion, Dkt. 46 ("Ruiz Decl."), and attached exhibits; Katergaris's Local Rule 56.1 counter-statement, Dkt. 50 ("Pl. 56.1"); his declaration in opposition to the motion, Dkt. 48 ("Katergaris Decl."), and attached exhibits; the declaration of Diana K. Simpson in opposition to the motion, Dkt. 49 ("Simpson Decl."), and attached exhibits; the City's Local Rule 56.1 counter-statement, Dkt. 53 ("Def. Reply 56.1"); and the declaration of Samantha Schonfeld in further support of the motion for summary judgment, and attached exhibits, Dkt. 52.

4

approximately a dozen properties himself or as a member of an LLC, had lawyers check whether there were any outstanding liens on the Property.  Katergaris Dep. at 11.  At the time of the purchase, Katergaris lived in England.  His then-wife moved into the W 132nd St. property upon the purchase; Katergaris moved in about six months later, in May 2015.  Def. 56.1 ¶¶ 49–50. During those six months, Katergaris stayed at the Property when he visited New York, which he did, among other times, on a three-to-four day stay in March 2015.  *See id.* ¶ 49; *see also* Def. Reply 56.1 ¶ 49.

### 1. DOB's Procedures for Mailing Notices of Violation

DOB's procedure for issuing and mailing notices of violation for property owners who fail to file low-pressure boiler inspection reports is as follows.

First, DOB processes all inspection reports that are filed for a given inspection period. *Id.* ¶ 11.  DOB then compiles a list of properties for which it did not receive a required inspection report.  *Id.*  From this, DOB creates a list of the owners of the properties with such delinquencies. *Id.* ¶¶ 11–13; *see also* Pl. 56.1 ¶¶ 12–13.  DOB then exports a list of properties and owners and sends that file to a vendor, Vanguard Direct ("Vanguard"), to mail out violation notices.  Def. 56.1 ¶ 14.[3]  Vanguard has done such work for DOB since 2001.  *Id.*

---

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[3] Katergaris notes that neither DOB nor Vanguard had put these mailing policies in writing, but he does not dispute that these procedures were, in fact, in place.  *See, e.g.*, Pl. 56.1 ¶¶ 27, 34.

Upon receiving the list, Vanguard uses a DOB template to produce sample violation notices, which it sends to DOB for review. *Id.* ¶ 15. Upon DOB's approval, Vanguard mass-produces notices of violation and "arranges for these DOB notices of violation to be mailed out to property owners via U.S. Postal Service First-Class mail." *Id.* ¶ 16. Vanguard subcontracts with a separate company, AST Document Solutions ("AST"), which physically mails out the notices. Pl. 56.1 ¶ 28; *see also* Def. Reply 56.1 ¶ 28. Although it is not clear when Vanguard began subcontracting with AST, or who at DOB knew about AST and when, all agree that at all times relevant here, AST was in charge of mailing out the notices on behalf of Vanguard. *See* Pl. 56.1 ¶ 29; Def. Reply. 56.1 ¶ 29. AST sent notices of violations by first-class mail, which does not produce a delivery receipt. Pl. 56.1 ¶ 40.

In this capacity, AST would run a "CAS certification slash," in which the addresses to be used for the mailing would be validated and then "pre-sorted." Muniz Dep. at 52. Pre-sorting entails placing the mail in order by zip code before delivering it to the post office. *Id.* at 52. After pre-sorting, AST used machinery to stuff the envelopes for mailing. *Id.* at 44–45, 48. At various points in this production process, these mailings would be counted to ensure that the correct number were mailed out. *Id.* at 46. Sometimes, items of mail would be damaged in the inserting process. In that instance, the damaged mailings would be reprinted and an individual at AST would manually put them back into the pre-sort order. *Id.* at 48–49.

When the mailings were ready to go out, AST would fill out a USPS Form 3600 to present to the USPS upon delivery. *Id.* at 55–56. The USPS Form 3600 is "basically an affidavit or a form that describes what is being delivered and accepted to [and by] USPS." *Id.* at 56. USPS would then accept or reject (in whole or part) the mailing, process the items to be mailed, and deposit them into the mail stream. *Id.* at 51, 58–62.

For large-batch mailings like the notices at issue here, AST, through Vanguard, sent out the letters under DOB's permit with USPS. As such, postage was not manually applied. Rather, the mail would be sent out, affixed with DOB's permit number, and the correct postage amount would later be charged to DOB's account. *Id.* at 27–29.

After AST deposited a mailing with USPS, it would provide a confirmation to Vanguard, by phone or email; Vanguard in turn would confirm the mailing with DOB. *Id.* at 33–34. Some time after receiving that confirmation from AST, Vanguard would also receive a completed Form 3600 from AST as part of the normal procedures for closing out mailing projects. *Id.* at 55.

Once mailings were sent out, any notices that could not be delivered were returned to the DOB, the address of which is listed on the envelopes as the return address. *Id.* at 51–52; Ruiz Dep. at 27. The returned notices would go to DOB's mailing unit; the City's 30(b)(6) representative did not recall whether these mailings were then archived or shredded. Ruiz Dep. at 30–31. The City would not then take additional steps to attempt to deliver the returned notices to the property owner addressees. Ruiz Dep. at 31. After receiving confirmation of the mailing, however, DOB would "reflect the violations on each property's publicly accessible profile on DOB's Business Information System ('BIS') website." Def. 56.1 ¶ 18.

## 2. The Mailing of the 2015 Notice of Violation to Katergaris

Although Katergaris claims to have been unaware that a low-pressure boiler ever existed at the W 132nd St. Property, he does not dispute that (1) during the 2013 inspection cycle period the Property had such a boiler, (2) the then–property owner had been required to file an inspection report for this boiler, and (3) DOB's records reflect that no such report was filed for that cycle. *See* Pl. 56.1 ¶ 19. DOB accordingly registered a violation of the inspection report filing requirement for the W 132nd St. Property.

In early 2015, DOB set into motion the process for mailing notices of violation for the 2013 inspection cycle. Def. 56.1 ¶ 20. The W 132nd St. Property appeared on DOB's final spreadsheet listing properties for which the required inspection report had not been filed; the owner for this address was noted as "Serafim Georgios Katergaris." *Id.* ¶ 20; *see also* Ruiz Decl., Ex. A. The DOB then exported the spreadsheet to a text file to send to Vanguard.

On March 16, 2015, DOB employee Juan Ruiz ("Ruiz") emailed Vanguard employees Mike Muniz ("Muniz") and Aska Asgher ("Asgher"), notifying them that DOB would be mailing a total of 17,919 notices, and asking Vanguard to put together a sample notice for each borough for DOB's review. Def. 56.1 ¶ 21. Muniz provided the requested samples the next day, March 17, 2015. Muniz sent 50 samples for DOB approval, which included samples for the first and last violations on the spreadsheet, and samples from all five boroughs. Ruiz Decl., Ex. B.

In 2015, Vanguard was working with AST to send out DOB notices. *See* Muniz Dep. at 20 (noting that the AST representative at the time, Joel, is no longer employed by AST). Muniz testified that Vanguard followed the procedures set out above when processing DOB's 2015 mailing of notices of violation, including in its dealings with AST. Muniz Dep. at 45–46.[4]

On Monday, March 23, 2015, Ruiz reached out to Muniz to confirm with Vanguard that the notices had been sent the previous Saturday. Ruiz Decl., Ex. B. Muniz responded that he was "checking with operations on a confirmation"; he soon followed up, telling Ruiz that "[t]he mailing was delivered Saturday, but not into the mail stream until today. [Vanguard] did also deliver some reprinted pieces that were damaged during inserting to the post office [that day,

---

[4] During the 2015 cycle, some notices of violation were damaged during the insertion process; AST notified Vanguard of this and reprinted the damaged pieces for mailing. *Id.* Two items in the 2015 batch did not qualify for presort with the USPS, and thus were sent separately with postage arranged separately. Neither appears to have related to Katergaris. *Id.* at 61–62.

March 23, 2015]." Ruiz Decl., Ex. B.  With this confirmation in hand, DOB posted the violations to the BIS website.  In addition, after confirming over email that the mailing had been sent out, Vanguard received the completed Form 3600 from AST, covering the 2015 mailings. Muniz Dep. at 33.[5]

Ruiz estimated that, of the approximately 18,000 notices that went out in 2015, no more than 500 would have been returned to the DOB as undeliverable.  Ruiz Dep. at 28.  The record does not reflect which particular notices in 2015 were returned as undeliverable.

Katergaris attests that neither he, nor his then-wife, received a notice of violation in the mail at the Property in 2015.  Pl. 56.1 ¶ 51.  He testified that his then-wife's practice had been to collect mail delivered to the Property and set it aside for him, and to tell him when mail had come for him.  Id. ¶ 50.  He testified that he always collected the mail set aside for him when he visited the Property.  Id. ¶¶ 50–51.  He testified that his ex-wife did not check the mail every day, because she "traveled quite a bit," mainly for work.  Katergaris Dep. at 12.  But, Katergaris testified that he presumes that, on her return, his then-wife would collect mail that had been delivered while she was away.  Id. at 14.  The evidence does not address whether or not Katergaris's then-wife, who was not deposed, was traveling in March 2015.  Id. at 12 (Q: "Okay. Was she traveling in or around March of 2015?"  A: "I don't remember. I don't recall.  She's the ex-wife.").

The W 132nd St. Property did not have a mailbox in 2015.  Id. at 13.  Instead, "[s]ome mail would be left in a little plastic bag hanging on the gate.  Some would be thrown down in the lower entrance.  Sometimes it'd be left on the stoop."  Id.  Katergaris did not recall problems

---

[5] During discovery, Vanguard obtained the Form 3600 from AST.  Pursuant to its standard procedure for destruction of records after seven years, Vanguard had disposed of its records from the 2015 mailing.  Muniz Dep. at 13–15.

receiving mail at the property, or any instance in which he expected mail at the W 132nd St. Property but did not receive it.  *Id.* at 14–15.

Katergaris states that he did not learn that there had been a notice of violation for 2013 until 2021, when he was selling the Property and his lawyers notified him that the violation had been reported on the purchaser's title report.  Katergaris Decl. ¶ 6.  At that time, he testified, "because [he] wanted the sale of the Property to go through, [he] paid the violation under protest on June 9, 2021."  *Id.* ¶ 21.  After making that payment, Katergaris continued to "pursue the issue with the [C]ity," on the ground that, having not owned the Property in 2013, he had not been responsible for the 2013 boiler annual inspection report.  *Id.* ¶ 22.

## B.    Legal Principles Applicable to Summary Judgment Motions

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**C.    Discussion**

In pursuing summary judgment on Katergaris's due process claim, the City argues that his claim was untimely. *See* Def. Br. at 5–15. A three-year limitations period applies to Section 1983 violations that occurred in New York, *Gleason v. McBride*, 869 F.2d 688, 691 (2d Cir. 1989) (citing *Owens v. Okure*, 488 U.S. 235, 251 (1989)), and Katergaris commenced this lawsuit on August 30, 2022, Dkt. 1, making his claim untimely if it accrued before August 30, 2019. The City argues that the claim accrued in 2015 when, it contends, a notice of violation was mailed to Katergaris pursuant to DOB standard procedure. *See* Def. Br. at 6. Katergaris contends, however, that the claim did not accrue until 2021 when, he claims, he first learned of the violation. *See* Pl. Br. at 1.

"Federal law governs the question of when a federal claim accrues notwithstanding that a state statute of limitations is to be used." *Morse v. Univ. of Vt.*, 973 F.2d 122, 125 (2d Cir. 1992). A federal Section 1983 claim "accrues when the plaintiff knows or has reason to know of the harm." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994). Here, when Katergaris knew or had reason to know of the alleged due process violation turns on whether, in 2015, he had notice of violation by mail.

In considering that question, the Second Circuit applies a common law "mailbox rule." Under that rule, where a party "provides evidence that [mailings] were properly addressed and

mailed in accordance with regular office procedures, it is entitled to a presumption that the notices were received." *Akey v. Clinton County*, 375 F.3d 231, 235 (2d Cir. 2004) (quoting *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985)).[6] Where a party produces enough evidence to trigger this presumption of receipt, the burden of proof shifts to the party claiming non-receipt to rebut the presumption and show that a genuine issue of material fact exists as to receipt of the mail in question. *See Meckel*, 758 F.2d at 818 (citing Fed. R. Civ. P. 56(e)).

"Denial of receipt, without more, is insufficient to rebut the presumption." *Akey*, 375 F.3d at 235. Rather, where the presumption has been established based on the existence of regular mailing procedures, "in addition to denial of receipt . . . [there must be] some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable." *Meckel*, 758 F.2d at 817. Such may take the form of "circumstantial evidence rebutting proof of mailing," *id.* Regardless of the form of evidence, the party opposing the presumption must establish "specific facts" supporting a conclusion of non-receipt to defeat the presumption once established, *see In re Great Atl. & Pac. Tea Co., Inc.*, 618 B.R. 57, 67 (S.D.N.Y. 2020), *aff'd sub nom.*, *Great Atl. & Pac. Tea Co., Inc. v. Nat'l Union Fire Ins. Co.*, 850 Fed. App'x 811 (2d Cir. 2021).

The Court considers first whether the City has triggered the presumption and second whether Katergaris has adduced evidence sufficient to rebut it.

---

[6] The parties spar over whether the federal or New York State iteration of this presumption applies. *See* Pl. Br. at 5–8; Def. Reply Br. at 2–3. There is limited daylight between these standards. Heeding the Second Circuit's guidance, the Court applies the federal standard, while considering New York cases as persuasive but not controlling authority as to the same. *See, e.g.*, *Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993) (applying federal mailbox rule to Section 1983 claim, but citing New York case law applying state-law equivalent, because, "[e]ven if New York law is not regarded as controlling on this issue, moreover, we find these authorities persuasive on the facts of this case"); *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92–93 (2d Cir. 2010) (applying federal presumption of receipt).

### 1.     The City's Evidence Triggers the Presumption of Receipt

The City has adduced sufficient admissible evidence both that the mailing to Katergaris

was properly addressed and that it was sent pursuant to normal office procedures, so as to trigger

a presumption of receipt.

First, it is undisputed that the mailing was properly addressed with the correct address

that the City had on file: "124 W 132nd Street, New York, NY 10027-7802." Def. 56.1 ¶ 20

("An excerpt of DOB's final Excel sheet of low-pressure boilers for which an annual inspection

report was not received for the 2013 cycle included 'Serafim Georgios Katergaris' at the [W

132nd St. Address]"); Pl. 56.1 ¶ 20 (not disputing this fact). Thus, there is competent evidence

that the notice of violation was properly addressed.

Second, the City has adduced sufficient evidence that the mailing was sent in accordance

with regular office procedures. In his deposition testimony and sworn declaration, DOB's

Federal Rule of Civil Procedure 30(b)(6) representative, Ruiz, attested to DOB's annual process

of compiling a list of properties for which there had been no inspection report filed and matching

these properties to the property owners. *See, e.g.*, Ruiz Dep. at 56–57, 63–64; Ruiz Decl. ¶¶ 6–8.

Ruiz further attested to DOB's internal processes for assuring the accuracy of this list and its

process for sending the list to its mailing vendor Vanguard, which produced sample notices for

further DOB review. Ruiz Decl. ¶¶ 6–11. Ruiz also attested to DOB's process for reviewing

and approving these samples; for directing Vanguard as to the day on which the mailings were to

be sent by Vanguard via first-class mail; and for confirming with Vanguard via email that the

mailings had been completed. *See* Ruiz Dep. at 25. Ruiz testified that DOB would then post the

violations on its public website. Importantly, both Ruiz and Vanguard's witness, Muniz—each

of whom personally participated in this process for 2013 violations—attested that these

procedures were followed in 2015. The City also produced emails corroborating this testimony. *See, e.g.*, Ruiz Decl. ¶¶ 14–20; Muniz Dep. at 23.

That evidence, viewed in totality, is sufficient to establish that regular office procedures for mailing notices of violations existed in 2015 and were followed in connection with the notice of violation the City prepared for Katergaris. *See, e.g., Bronia, Inc. v. Ho*, 873 F. Supp. 854, 859–60 (S.D.N.Y. 1995) (presumption of receipt triggered by testimony from office personnel as to normal office procedures, despite the lack of firsthand knowledge as to specific mailing at issue); *Ma*, 597 F.3d at 92 (presumption of receipt triggered where "the record establishes office procedures, followed in the regular course of business, pursuant to which notices have been addressed and mailed"); *In re East Coast Brokers and Packers, Inc.*, 961 F.2d 1543, 1545 (11th Cir. 1992) (testimony setting out specific office procedures such as that the "[employees] make a photo copy and it goes to the receiver" established presumption of receipt). Accordingly, the City is entitled to a presumption that Katergaris received the 2015 notice of violation.

Katergaris's arguments to the contrary fail. First, he asserts that the City has not come forward with any evidence from an affiant with "personal knowledge" of DOB's "customary mailing practices." Pl. Br. at 8 (quoting *Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 136–37 (3d Cir. 2019)). He bases this claim on the observation that the City has not offered testimony "from the company that actually conducted the mailing"—AST. *Id.* at 9. He thus argues that, to trigger the mailbox rule and the associated presumption of receipt in a case where a party used a third-party vendor to perform the physical mailing at issue, the party must come forward with a witness with personal knowledge of that third-party's mailing practices. *See id.* at 8–11.

The case law does not support such a requirement. Rather, it is sufficient to establish mailing in accordance with normal office procedures to submit an affidavit or testimony from an

individual who oversees these procedures. That those procedures entail the participation of employees of both the party and a third-party vendor does not render such testimony inadequate. *See, e.g., In re Adler, Coleman Clearing Corp.*, 204 B.R. 99, 104–05 (S.D.N.Y. 1997) (affidavit from trustee overseeing mailing of claim packages sufficient to establish presumption even where mailing procedures included use of third-party vendor to assemble, print, and mail such packages and where no affidavit or evidence from third-party vendor was submitted); *BASF Corp. v. Norfolk Southern Ry. Co.*, No. 04 Civ. 9662, 2008 WL 678557, at *5 & n.13 (S.D.N.Y. Mar. 10, 2008) (presumption of receipt established on basis of normal office procedures where last step in mailing procedure was that mail was "carried to the main [company] mailroom in Atlanta for handling and disbursement"); *In re E. Coast Brokers & Packers, Inc.*, 961 F.2d at 1545–46 (evidence of regular office procedures sufficient to trigger presumption where it showed that notices were put together and sent out to regulatory authority and the recipient at the same time, with the "girls in the office" in charge of "carry[ing] out the rest").

Here, the City's affiants—an employee of the City and an employee of its third-party vendor, Vanguard—have each attested to personal knowledge of the normal office procedures used by their respective employers at the relevant time for the types of mailings in question. Vanguard's Muniz, in particular, testified to his personal familiarity not only with Vanguard's procedures, but with the bulk of the mailing practices that its vendor, AST, used, and that these were followed during the period at issue. *See, e.g.*, Muniz Dep. at 27–29 (attesting that AST would mail out notices on the DOB's postal account and permit number, such that USPS would charge DOB postage after the fact rather than requiring that a unique postal charge appear on each envelope). The case law requires only personal knowledge of DOB's regular office mailing procedures. The City has produced such evidence here, triggering the presumption of receipt.

*Mason v. Midland Funding LLC*, 815 Fed. App'x 320 (11th Cir. 2020), on which

Katergaris relies, does not assist his cause. The Eleventh Circuit there held that a declaration

from an affiant-employee of the company Bluestem did not evince the required personal

knowledge of normal office mailing procedures where the mailing in question was actually

carried out by two contracted third parties. *Id.* at 327. In so holding, the Circuit emphasized that

Bluestem's affiant not only did not "work for either of the third parties that supposedly

completed the mailing" but he also "never attested that he reviewed any of [the third parties']

records showing that the [mailing] was in fact sent to [the appellant]." *Id.* Here, in contrast,

there is testimony not only from DOB, but from Muniz, an employee of third-party Vanguard,

who attested to Vanguard's mailing procedures based on personal knowledge. *See generally*

Muniz Dep. And both Muniz, on behalf of Vanguard, and Ruiz, on behalf of the City, attested to

having reviewed records or received contemporaneous communications confirming that

Vanguard and AST had mailed out the batch of notices—including that destined for Katergaris.

*See, e.g.*, Muniz Dep. at 33 (testifying that he received confirmation from AST that the 2015

mailing had been sent and communicated this to the DOB); Ruiz Dep. at 25 (testifying that

Vanguard would confirm with Ruiz when mailings had been sent out). Muniz further testified

that, in addition to receiving an informal confirmation from AST to this effect, he later, in the

regular course of business, received a USPS Form 3600 from AST confirming that the 2015

mailing had been placed in the mail stream with the USPS. Muniz Dep. at 33. Thus, relative to

*Mason*, where the defendants "rel[ied] solely on the [single] declaration to show" that an item

had been placed in the mail, the City here produced a greater breadth and depth of evidence supporting the same.[7] That entitles the City to a presumption of receipt.

Katergaris next argues that any presumption of receipt here should be a weak one, and that a "strong" presumption of receipt is available only where the mailing party utilized certified mail as opposed to the first-class mail used here. Pl. Br. at 12–13.[8] But the Second Circuit has only ever vaguely endorsed such a distinction, and even then only in the immigration context. There, the Circuit has held that a "strong" presumption of receipt as adopted by the Board of Immigration Appeals applied only in the case of certified mail, but that "even in the context of regular mail, a presumption of receipt is proper so long as the record establishes that the notice was accurately addressed and mailed in accordance with normal office procedures." *Lopes v. Gonzales*, 468 F.3d 81, 84 (2d Cir. 2006) (citing *Matter of Grijalva*, 21 I & N Dec. 27 (BIA 1995)). If anything, this holding reaffirms that the default common-law mailbox rule, and the relative strength of the presumption it erects, does not depend on the use of certified mail.

Indeed, the Second Circuit has never drawn such a line in applying the general common law mailbox rule, *see id.* at 85 (noting Circuit's "own holding . . . outside the immigration context," that in the context of regular mail, a "presumption of receipt exists where a piece of mail is 'properly addressed and mailed in accordance with regular office procedures'" (quoting *Akey*, 375 F.3d at 235)). It has not adopted the reasoning of the Third Circuit decision on which

---

[7] To the extent that Katergaris reads *Mason* more sweepingly—to demand testimony from an employee of each third-party vendor involved in the mailing process before the presumption is triggered—that out-of-circuit unpublished opinion is not consistent with the Second Circuit caselaw above.

[8] Katergaris also briefly critiques the City's process for dealing with notices returned by mail. That process, however, is not germane to whether the City has triggered a presumption of receipt but to whether Katergaris has rebutted it. The Court considers that issue in the section below.

Katergaris relies, either, under which a "weaker" presumption applies where the sender's regular procedures entailed the use of first-class mail. *See* Pl. Br. at 12–13 (citing *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 319 (3d Cir. 2014)).; *cf. Ma*, 597 F.3d at 92 (applying normal presumption of receipt where mailing sent by regular mail); *Baldwin v. United States*, 921 F.3d 836 (9th Cir. 2019) (analyzing whether statutory/regulatory regime in tax context, which provides presumption of receipt only in the case of certified mail, displaced common-law mailbox rule, which applies to documents sent by regular mail); *see also In re Greenberg*, 526 B.R. 101, 108 (E.D.N.Y. 2015) (rejecting a similar argument based on *Lupyan*).

Further, there is a sound basis for not extending this distinction to the mailings at issue. In some contexts, it would not be "expecting too much to require businesses" or other senders "that wish to avoid a material dispute about the receipt of a letter to use some form of mailing that includes verifiable receipt." *Lupyan*, 761 F.3d at 322. But the context at issue here is relatively quotidian. DOB is a government entity (not a profit-making concern) that annually sends out some 20,000 violation notices concerning low-pressure boilers alone. Katergaris has not explained why it is reasonable to demand that DOB, to secure the presumption of receipt in this context, be obliged to send out these notices by the more expensive and cumbersome process of certified mail. Nor has he identified caselaw conditioning the presumption of receipt on a governmental entity's having used certified mail for such workaday communications. *See, e.g., O'Toole v. U.S. Sec'y of Agric.*, 31 C.I.T. 79, 88 n.13 (2007) ("[I]t bears noting that a close reading of the case law on the mailbox rule suggests that the rule's application in particular areas of the law is, in certain respects, colored by policy or other considerations specific to those individual areas of law."). The presumption instead has its basis on the empirical likelihood of receipt where reasonable mailing procedures have been followed. *Cf. Rosenthal v. Walker*, 111

U.S. 185, 193 (1884) (impetus for mailbox rule was the "inference of fact" based "on the probability that officers of the government [*i.e.*, the post office] will do their duty and the usual course of business").

Accordingly, this Court, having found the presumption of receipt to apply, will give it the same weight the Second Circuit has uniformly given it outside the immigration context.

### 2. Katergaris Has Failed to Adduce Evidence Sufficient to Rebut the Presumption of Receipt

Katergaris has failed to come forward with evidence of his non-receipt of the notice sufficient to give rise to a genuine issue of material fact. In claiming to be able to rebut the presumption, Katergaris principally relies on three categories of evidence: (1) his testimony denying receipt and describing his practice of paying fines on time; (2) his testimony as to procedures he used to access mail delivered to his W 132nd St. address in 2015; and (3) the City's procedure for handling notices returned as undeliverable. Viewed separately or together, these do not enable him to carry his burden here given the triggering of the presumption.

First, Katergaris's denial of receipt does not raise a genuine issue of material fact as to the fact of receipt. It is well-established in this Circuit that a recipient's mere denial of receipt is not sufficient to rebut the presumption of receipt. *Ma*, 597 F.3d at 92 (citing *Akey*, 375 F.3d at 235). Katergaris offers scant evidence in support: his claim to have paid earlier citations or tickets on time, Katergaris Decl. ¶ 19, and the fact that, on learning of the outstanding boiler violation in 2021, he paid the fine, *id.* ¶¶ 20–21. Katergaris's general and unsubstantiated attestations, which likely could be given by the large majority of persons denying receipt of mail, are insufficient without more to rebut the presumption of receipt. *See, e.g.*, *In re Robinson*, 228 B.R. 75, 82 (E.D.N.Y. 1998) ("The federal courts in New York . . . 'hold quite uniformly that an affidavit of non-receipt is insufficient to rebut the presumption of receipt.'" (quoting *In re*

19

*Malandra*, 206 B.R. 667, 673 (E.D.N.Y. 1997)); *Leon*, 988 F.2d at 309 (where only evidence to rebut the presumption of receipt established via affidavits as to regular office procedures were denials by the plaintiff and his wife that they received the mailings, the presumption stood); *cf.* *Ghounem v. Ashcroft*, 378 F.3d 740, 745 (8th Cir. 2004) (sworn statement denying receipt, coupled with defendant's documented history of appearing for same type of hearing for which he claimed to not have received notice, and defendant's lack of benefit to gain by failing to appear, sufficient to rebut presumption of receipt). And his payment of this fine, which appears to have been necessary to enable him to complete the sale of the Property, does not speak to whether he would have paid the fine in 2015 had he received the notice of violation.

Second, Katergaris's account of his and his then-wife's whereabouts, and their practices with respect to mail at the W 132nd St. Property in March 2015, makes it, if anything, less plausible that the 2015 notice of violation went undelivered—as opposed to having been overlooked or not responded to. As Katergaris testified, he was generally *not* living at the Property in March 2015, save for monthly visits lasting several days, meaning his then-wife was in charge of collecting the mail and setting it aside for him. Pl. 56.1 ¶¶ 50–51. But Katergaris testified that his ex-wife also frequently travelled for work, and the couple did not have anyone collect their mail in her absence. Katergaris Dep. at 12, 14. And Katergaris did not adduce any testimony from his ex-wife. Thus, his account of her practices with respect to handling incoming mail—including whether she was rigorous or not in reviewing and maintaining it—is largely hearsay, and to the extent not, entitled to limited weight. Katergaris also did not adduce any evidence as to his ex-wife's whereabouts during March 2015.

Further undermining his case on this issue, Katergaris admitted that the Property in 2015 lacked a mailbox, such that mail delivered to it would apparently be left in any number of places,

including hung on the Property's fence in a baggy, or on the front stoop. Katergaris Dep. at 13. This portrait of sloppy, if not collegiate, practices with respect to incoming mail is at odds with the inference Katergaris seeks to raise of a system of receiving, collecting, and responding to mail so rigorous and orderly that it would have been improbable for a delivered mailing to have gone unacted-upon.

Finally, Katergaris has not alleged any specific facts concerning the City's process for mailing notices in 2015 to make application of the presumption of receipt unreasonable. He notes that the City admitted that some 500 of the approximately 18,000 notices sent in 2015 were returned to the DOB as undeliverable, and the DOB has not proven that the notice mailed to Katergaris was not among the returned notices. Pl. Br. at 12–13.

That argument does not follow. There is no basis to infer that the mailed notice to Katergaris was among the fewer than 3% of notices estimated to have been returned. On the contrary, it is undisputed that Katergaris's envelope was correctly addressed. It is also undisputed that Katergaris's notice was among those sent out on the DOB's USPS permit, such that insufficient postage could not have interfered with its delivery. And Katergaris himself disclaimed that he had any actual problems with receiving mail at the W 132nd St. address. *See* Katergaris Dep. at 14–15. Moreover, given the tiny share of mailings that were returned, Katergaris's reliance on the purely theoretical possibility that his was among them would undermine the concept of a presumption. On the record at hand, a finder of fact would not have any non-speculative basis to find the presumption of receipt rebutted. *See e.g.*, *Shao Ling Zhang v. Gonzales*, 230 Fed. App'x 57, 58 (2d Cir. 2007) (judge did not abuse discretion in finding that "uncorroborated claim of mailbox vandalism" failed to rebut presumption); *In re FKF 3, LLC*, 501 B.R. 491, 501 (S.D.N.Y. 2013) (presumption of receipt unrebutted where opponent did not

set forth specific facts to substantiate possibility that properly addressed notice was accidentally delivered to different tenant at building); *In re Great Atlantic & Pacific Tea Co., Inc.*, 618 B.R. at 67 (general allegations lacking "any specific instances of mis-delivery or non-delivery or the relevant circumstances" did not rebut presumption); *cf. BASF Corp.*, 2008 WL 678557, at *5 ("Plaintiff provides no proof that there was a breach in procedure or carelessness on the part of the sender as the standard requires.").

The Court accordingly holds that Katergaris has failed to adduce evidence sufficient to rebut the presumption of receipt in this case.  Given the unrebutted presumption that he received the notice of violation in 2015, Katergaris's claim based on that notice accrued in 2015, such that the three-year limitations period had long since expired by the time Katergaris filed this lawsuit in 2022.

## CONCLUSION

For the foregoing reasons, the Court grants the City's motion for summary judgment and dismisses this case as time-barred.  In light of this ruling, the Court does not have occasion to address the City's other arguments for dismissal.

The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: June 24, 2024
       New York, New York